UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | |
|---|---|
| **KEITH R. MASSEY,** | Civil Action No. 15-3613 (SRC) |
| **Plaintiff,** | |
| v. | OPINION |
| **ROY L. HENDRICKS, et al.,** | |
| **Defendants.** | |

**CHESLER**, District Judge:

This matter comes before the Court on the motions for summary judgment filed by Defendants.[1] (ECF Nos. 84, 87). After being provided with a number of extensions, Plaintiff filed a response to the motions. (ECF No. 92). Plaintiff's response, however, did not include a statement of material facts in dispute, nor did it address in any substantive way Defendants' statements of material facts. Defendants filed reply briefs. (ECF Nos. 93-94). The Court having reviewed the motions and the record of this matter, and for the reasons set forth below, Defendants' motions shall be granted, and judgment shall be entered in favor of Defendants. As judgment shall be granted to Defendants, the Correction Officer Defendants' third party-complaint shall in turn be dismissed.

---

[1] Throughout this opinion, this Court refers to both the "Medical Defendants" and the "Corrections Officer Defendants." The term Medical Defendants refers to Defendants Kelly, Ojelade, Annicette, Rizvi, and CFG Health Systems, which is named only as a third-party Defendant. The Corrections Officer Defendants instead refers to Defendants Wohl, Brandt, Condito, Shelly, Alvarez, and Hendricks.

1

**I. BACKGROUND**

This matter arises out of the medical care Plaintiff received while incarcerated in the Essex County jail between August 15, 2014 and the filing of Plaintiff's complaint in this matter on May 28, 2015.[2] Prior to being arrested and brought to the jail, Plaintiff has had a long history of hip and back pain problems. (Document 2 attached to ECF No. 84 at 3, 18-20). Following his arrest, he was taken to the St. Barnabas Medical Center for treatment of his hip and back pain. (*Id.*). At the hospital, Plaintiff was provided with an injection of Toradol, an anti-inflammatory pain medication, and an oral dose of Tramadol, a "narcotic-like pain reliever." (*Id.*). Upon his discharge from the hospital, Plaintiff was provided with non-refillable prescriptions for ibuprofen and tramadol for his pain. (*Id.*).

On August 14, 2014, Plaintiff arrived at the jail and was given an initial intake screening by a jail nurse, at which time the nurse noted both Plaintiff's complaints of hip and back pain and his use of a cane. (*Id.* at 4). The following day, Plaintiff was seen by Kevin Kelly, a nurse practitioner, who took a detailed medical history of Plaintiff and offered Plaintiff several non-steroidal anti-inflammatory pain medications, including naproxen and ibuprofen, which Plaintiff refused, requesting that he instead be provided with narcotic pain medication such as Percocet.[3]

---

[2] Because Plaintiff did not file a statement of material facts in dispute or otherwise directly respond to Defendants' statements of material facts, and because Defendants' statements accurately summarize the jail medical records submitted in this matter, this Court draws its summary of Plaintiff's jail medical treatment from the Medical Defendants' Statement of Material Facts not in dispute, which, as explained below, is considered unopposed for the purposes of this opinion pursuant to Federal Rule of Civil Procedure 56(e)(2) and Local Civil Rule 56.1.

[3] This was apparently not the first time Plaintiff had differed with doctors over their refusal to provide him with opioid pain relievers. In June 2014, while being treated for his hip and pain issues at Zufall Medical Center, Plaintiff sought pain and insomnia medication and walked out of the clinic when he was told that they would not provide him with the requested medications. (Document 2 attached to ECF No. 84 at 7). Like the jail practitioners, the doctors at Zufall recommended Plaintiff take naproxen for his pain. (*Id.* at 8).

2

(*Id.*).  Although the jail declined to provide Plaintiff Percocet, he was placed in a special needs unit and referred to an orthopedist for an evaluation.  (*Id.*).  Kelly also referred Plaintiff for an evaluation of whether a further prescription of tramadol was required.  (*Id.*).  Plaintiff, despite his initial refusal, was thereafter provided naproxen for his pain throughout August of 2014.  (*Id.*).  Plaintiff thereafter received his orthopedic consultation on September 5, 2014, with Dr. Paul O'Connor.  (*Id.* at 5).  O'Connor determined that Plaintiff was likely a candidate for a double hip replacement and prescribed tramadol for Plaintiff.  (*Id.*).  Because Tramadol was not available at the jail at the time, Plaintiff was provided instead Tylenol #3 with codeine, a pain medication containing both acetaminophen and the opioid pain medication codeine which is used to treat moderate to severe pain, by Defendant Ojelade.  (*Id.* at 5).  Because his current cane was damaged, the jail also ordered a new cane for Plaintiff on September 10, 2014.  (*Id.*).  Plaintiff received his new cane on October 2.  (*Id.* at 6).

On September 12, 2014, Plaintiff was again seen by an orthopedist, this time Dr. Anthony Kaiser.  (*Id.* at 5).  Dr. Kaiser examined Plaintiff's history and pain issues, and ordered that Plaintiff continue to receive Tylenol #3 and prescribed Plaintiff a sleep aid and night-time pain relief medication.  (*Id.* at 5-6).  Plaintiff thereafter received these medications, as well as his naproxen and other unrelated medications daily save for the instances in which Plaintiff refused his medication.  (*Id.* at 6).  On October 1, 2014, Plaintiff was again seen by Dr. O'Connor for a follow-up, and the doctor again noted Plaintiff would need bilateral hip replacement to alleviate his hip issues.  (*Id.*).  The doctor also recommended x-rays of both hips for further evaluation of Plaintiff's candidacy for hip replacements.  (*Id.*).  On October 22, Plaintiff was referred by Ojelade for an additional orthopedic consult with Dr. Kaiser, who saw Plaintiff on October 24.  (*Id.*).  Following this consultation, Dr. Kaiser recommended Plaintiff receive Tylenol #4, which differs from

3

Tylenol #3 only in that it contains additional codeine. (*Id.*). Because Tylenol #4 was not available at the jail, however, Plaintiff was instead offered an additional dose of Tylenol #3, which would provide him with the same additional codeine, which he received for the remainder of October and most of November unless refused by Plaintiff. (*Id.*).

On November 22, 2014, Plaintiff was seen by Kelly, who reviewed his medications, found Plaintiff in "no acute distress" and offered Plaintiff tramadol, which was not available, and naproxen for his pain. (*Id.* at 8). Plaintiff initially refused, but Kelly still prescribed him the pain medications twice a day. (*Id.*). When Plaintiff continued to complain of pain on November 24, he was also once again provided Tylenol #3 and was returned to the infirmary as he claimed difficulty walking. (*Id.*). On November 25, Plaintiff complained to a nurse of pain, but was able to walk and was not in distress. (*Id.*). Plaintiff again refused his prescribed pain medications, insisting on Tylenol #4, which he was not provided. (*Id.*). The following day, Plaintiff was again seen by Dr. O'Connor who referred him for further evaluations aimed at an eventual hip replacement. (*Id.* at 9). Following the visit, however, Dr. O'Connor noted that nonnarcotic pain relievers should be sufficient to manage Plaintiff's pain. (*Id.*). Following this visit, Plaintiff accepted tramadol and continued to receive non-steroidal anti-inflammatory pain medications and stretching and strengthening exercises were recommended to help Plaintiff deal with his pain. (*Id.*). Plaintiff, however, continued to complain of pain that he did not believe was adequately addressed by his medications. (*Id.*). Plaintiff was thereafter prescribed further medications on December 2, 2014, including Meloxicam, a pain reliever specifically designed for treating arthritic pain, Neurontin, an anti-convulsive sometimes used to treat nerve pain, and a corticosteroid in addition to Tylenol #3, naproxen, tramadol and other unrelated medications. (*Id.* at 10). Plaintiff was released from the infirmary on December 3, 2014. (*Id.*).

4

On January 5, 2015, Plaintiff returned to the infirmary after he complained of difficulty walking, and he was offered the use of a wheelchair. (*Id.*). Plaintiff was seen by Defendant, Dr. Rizvi, at which point Plaintiff again claimed that "only Percocet helps him." (*Id.*). Dr. Rizvi declined to provide Plaintiff with Percocet, and instead offered him naproxen, Tylenol #3, and a trial prescription of prednisone, an anti-inflammatory medication that might help his pain. (*Id.*). Plaintiff was also given a referral to a pain management clinic. (*Id.*). On several days between January 5 and January 13, 2015, Plaintiff refused his medication and other medical evaluations. (*Id.* at 11). Plaintiff's mother called jail medical staff, and he was ultimately prescribed ultram to aid him in managing his pain. (*Id.*). On January 25, 2015, Plaintiff was seen by mental health workers, and was referred to a psychiatrist on January 28 who prescribed further treatment with Neurontin and the antidepressant Remeron to aid Plaintiff with sleeping. (*Id.*). Plaintiff continued to receive naproxen, Tylenol #3, meloxicam, prednisone, and Tylenol with tramadol throughout January when he did not refuse medication. (*Id.*). On February 6, 2015, Plaintiff was again seen by Dr. O'Connor, and he added a complaint of a neck injury to his hip issues. (*Id.*). Dr. O'Connor prescribed him a muscle relaxant to aid with his discomfort. (*Id.* at 12). On February 21, Plaintiff again complained of pain, but he was given no new medications as the jail continued him on the path of referrals that would ultimately lead to hip replacements. (*Id.*). Throughout February, Plaintiff continued to receive his pain and other medications in February and March, although he was out of the jail between March 12 and March 17, 2015. (*Id.*).

On April 2, 2015, Plaintiff was scheduled for an orthopedic clinic at University Hospital. (*Id.* at 12). On April 11, following injuries Plaintiff apparently suffered in a transport van, Plaintiff was again referred to Dr. Kaiser, who treated him for neck and shoulder pain on April 15. (*Id.* at 13). Plaintiff continued to receive pain and other medications throughout March and April 2015.

5

(*Id.*).  On June 29, 2015, Plaintiff was taken to the clinic at University Hospital for an evaluation for hip replacement.  (*Id.*).  Doctors at the clinic again concluded that pain management with non-steroidal pain medication was sufficient to deal with Plaintiff's pain, and Plaintiff continued to be moved toward hip replacement surgery.  (*Id.*).   Plaintiff remained in the Essex County jail until July 16, 2015, but despite being provided with pain and other medications, he refused nearly all of them.  (*Id.* at 13-14).  During his deposition, Plaintiff clarified that his complaints against the Medical Defendants arise out of his belief that he was not provided sufficient pain medication as Defendants refused to give him oxycodone, Percocet, or Percodan and instead treated him with other medications which he did not believe were aimed at alleviating his pain.  (*Id.* at 15-18).  Following his release from prison, Plaintiff received a left hip replacement in July 2016, and a right hip replacement in April 2018, which largely alleviated his pain issues.  (*Id.* at 19).

In addition to his medical claims, Plaintiff also seeks relief from various Corrections Officer Defendants related to an incident that occurred on January 14, 2015.  On that date, at approximately 10 p.m., Plaintiff was released from the medical department to be placed in a regular cell.  (Document 1 attached to ECF No. 94 at 5-8, ECF No. 92 at 4-5).  After walking to the appropriate unit, Plaintiff was told he needed to climb the stairs and lock into his cell for the night. (*Id.*).  Plaintiff told the officers he was unable to climb the stairs.  (ECF No. 92 at 4).  The officers had no other cell available, but offered to carry Plaintiff to his cell, an offer Plaintiff refused.  (*Id.*). Defendants Brandt and Wohl told Plaintiff that if he did not go to his cell, he would be charged with a disciplinary infraction, but Plaintiff continued to state he couldn't climb the stairs.  (*Id.*). Plaintiff was thereafter charged for a disciplinary infraction for refusing to go to his cell, with or without help, as ordered, and he was moved to administrative segregation pending the outcome of jail disciplinary proceedings.  (*Id.*; Document 1 attached to ECF No. 94 at 5-8).  Upon his arrival

6

at the administrative segregation unit, he was again told to climb stairs to lock into a cell, and again stated that he could not do so. (*Id.*). Defendants Brandt and Alvarez therefore took Plaintiff's cane, picked him up, and carried him to his cell for the night. (*Id.*). The following day, Plaintiff was interviewed by a hearing officer, Defendant Condito, who said he would look into Plaintiff's medical issues and have Plaintiff released if it was clear that his refusal to go to his cell was based on his inability to climb the stairs. (ECF No. 92 at 5). Plaintiff was moved to a lower tier cell in the disciplinary unit and remained there for three days. (*Id.*). Plaintiff was thereafter released from the administrative segregation unit, allegedly without being told the result of his charges. (*Id.*). Prison records indicate that Plaintiff's charges were dismissed without any disciplinary action being taken. (Document 1 attached to ECF No. 94 at 43).

## II. DISCUSSION

### A. Legal Standard

Pursuant to Rule 56, a court should grant a motion for summary judgment where the record "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party bears the initial burden of "identifying those portions of the pleadings depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). A factual dispute is material "if it bears on an essential element of the plaintiff's claim," and is genuine if "a reasonable jury could find in favor of the non-moving party." *Blunt v. Lower Merion School Dist.*, 767 F.3d 247, 265 (3d Cir. 2014). In deciding a motion for summary judgment a district court must "view the underlying facts and all reasonable inferences therefrom in the light most favorable to the party opposing the motion," *Id.*, but must not make credibility determinations or engage in any weighing

7

of the evidence. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, [however,] there is no genuine issue for trial." *Matsuhita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

Once the moving party has met this initial burden, the burden shifts to the non-moving party who must provide evidence sufficient to establish that a reasonable jury could find in the non-moving party's favor to warrant the denial of a summary judgment motion. *Lawrence v. Nat'l Westminster Bank New Jersey*, 98 F.3d 61, 65 (3d Cir. 1996); *Serodio v. Rutgers*, 27 F. Supp. 3d 546, 550 (D.N.J. 2014). "A nonmoving party has created a genuine issue of material fact if it has provided sufficient evidence to allow a jury to find in its favor at trial. However, the party opposing the motion for summary judgment cannot rest on mere allegations, instead it must present actual evidence that creates a genuine issue as to a material fact for trial." *Serodio*, 27 F. Supp. 3d at 550.

Pursuant to Federal Rule of Civil Procedure 56(e)(2) and Local Civil Rule 56.1, where, as here, the moving party files a proper statement of material facts and the non-moving party fails to file a responsive statement of disputed material facts, this Court is free to consider the moving party's statement of material facts undisputed and therefore admitted for the purposes of resolving the motion for summary judgment. *See, e.g., Ruth v. Sel. Ins. Co.*, No. 15-2616, 2017 WL 592146, at *2-3 (D.N.J. Feb. 14, 2017). Even where the defendants' statement of material facts is deemed admitted and unopposed, a district court is still required to "satisfy itself that summary judgment is proper because there are no genuine disputes of material fact and that [defendants are] entitled to judgment as a matter of law" in order to grant summary judgment. *Id.* at 2 (citing *Anchorage Assocs. v. Virgin Islands Bd. Of Tax Review*, 922 F.2d 168, 175 (3d Cir. 1990)).

8

### B. Analysis

#### 1. Plaintiff's Medical Claims

Both the Medical Defendants and Corrections Officer Defendants argue that they are entitled to summary judgment as to Plaintiff's claims asserting that they were deliberately indifferent to his medical needs. As a pre-trial detainee during the relevant timeframe, Plaintiff's claim arises out of the Fourteenth Amendment. *Hubbard v. Taylor*, 538 F.3d 229, 231 (3d Cir. 2008). To state a claim for relief under the Fourteenth Amendment based on his medical treatment, a plaintiff must show both that he has a sufficiently serious medical need, and that the defendants were deliberately indifferent to that need. *See, e.g., Natale v. Camden Cnty. Corr. Facility*, 318 F.3d 575, 581-82 (3d Cir. 2003); *Parkell v. Morgan*, 682 F. App'x 155, 159-60 (3d Cir. 2017); *King v. Cnty. of Gloucester*, 302 F. App'x 92, 96 (3d Cir. 2008). A defendant acts with deliberate indifference when he "kn[e]w of and disregard[ed] an excessive risk to inmate health or safety." *Natale*, 318 F.3d at 582 (quoting *Farmer v. Brennan*, 511 U.S. 825, 837 (1994)). This requires that the defendant was "both [] aware of facts from which the inference could be drawn that a substantial risk of serious harm exists and . . . dr[e]w th[at] inference." *Id.* Where the defendants provided some level of treatment to address the plaintiff's medical needs and the parties dispute the adequacy of the provided treatment, courts "are generally reluctant to second guess medical judgments and to constitutionalize claims which sound in state tort law.'" *Everett v. Nort*, 547 F. App'x 117, 121 (3d Cir. 2013) (quoting *United States ex rel. Walker v. Fayette Cnty.*, 599 F.2d 573, 575 n. 2 (3d Cir. 1979)). Neither a detainee's subjective dissatisfaction nor disagreement with the professional judgment of medical staff as to how best to deal with a medical issue are normally sufficient to establish deliberate indifference. *Hairston v. Director Bureau of Prisons*,

563 F. App'x 893, 895 (3d Cir. 2014); *White v. Napolean*, 897 F.2d 103, 110 (3d Cir. 1990); *Andrews v. Camden Cnty.*, 95 F. Supp. 2d 217, 228 (D.N.J. 2000).

In litigating this matter, Plaintiff has repeatedly asserted that the Medical Defendants were deliberately indifferent to his needs insomuch as the medication they provided did not alleviate his pain to his satisfaction and that Defendants should have provided him with stronger medication – specifically narcotics such as Percocet or Percodan. Notwithstanding Plaintiff's subjective feelings of pain arising from his hip issues, Plaintiff has provided no expert testimony nor any proposed medical expert in support of his contention that stronger medications would have alleviated his pain and that the numerous pain medications he was provided were insufficient to manage his pain. The Medical Defendants, however, have provided both Plaintiff's medical records, which include the opinions of Plaintiff's jail orthopedist that the "non-narcotic medicine [provided to Plaintiff was] sufficient" to manage Plaintiff's pain and show that Defendants on multiple occasions adjusted Plaintiff's pain medication to better aid him, and an expert report prepared by Dr. Ricardo Ruiz, a licensed internist and hospitalist who has practiced in the field of correctional healthcare for eighteen years. (Document 5 attached to ECF No. 84 at 46-49). In his report, Dr. Ruiz opines that Plaintiff "was treated appropriately by the defendants and all health care providers for both his acute and chronic . . . pain" and that, given Plaintiff's history of admitted substance abuse "the providers were appropriately cautious in their treatment" of Plaintiff, including their decision not to provide him with the narcotic pain medications he desired. (*Id.* at 49). In total, Plaintiff's medical records and the report of Dr. Ruiz, in the absence of any conflicting expert testimony regarding the propriety of the level of treatment received, indicate that Plaintiff received ample medical care, that medical staff treated his hip issues as best they were able, and that Plaintiff received medically appropriate pain medication. As such, and in light

10

of the record before this Court, Plaintiff's claims against the Medical Defendants related to Plaintiff's treatment and pain medication present no more than Plaintiff's base disagreement with the treatment he received, which is patently insufficient to amount to deliberate indifference. Plaintiff's unsupported personal opinion that he should have been provided stronger pain medication is insufficient to change this fact. *White*, 897 F.2d at 110. The Medical Defendants are therefore entitled to summary judgment as to Plaintiff's claims against them.[4]

The Corrections Officer Defendants also argue that, to the extent Plaintiff is raising a claim against them based on deliberate indifference to his medical needs, they are entitled to summary judgment as they are entitled to rely on the treatment they knew him to be receiving from medical staff and Plaintiff has otherwise failed to show that they were deliberately indifferent to his needs. To the extent that Plaintiff has raised a medical claim against the Corrections Officer Defendants premised on a failure to intervene in his medical care, Defendants are correct that they are entitled to rely on the care provided by the Medical Defendants, and no such claim will lay. *See, e.g., Durmer v. O'Carroll*, 991 F.2d 64, 69 (3d Cir. 1993).

---

[4] In his complaint, Plaintiff also sought to raise a claim against Dr. Anicette, the head of the jail's medical department, for failing to correct his medical care following several complaints made by Plaintiff and his family. Even putting aside questions regarding whether this is a proper basis for supervisory liability, *see, e.g., Rode v. Dellarciprete*, 845 F.2d 1195, 1207-08 (3d Cir. 1988), as Plaintiff has failed to present facts sufficient to show he was receiving medically inadequate care, the doctor cannot be found to have been deliberately indifferent where the care he was asked to request was not itself inadequate. Likewise, to the extent Plaintiff sought to base his claim against Dr. Anicette on the failure to answer grievances, that claim fails for the reasons discussed below in relation to Defendant Hendricks. As with the remaining medical Defendants, Dr. Annicette is thus entitled to summary judgment. Similarly, any claim by Plaintiff based on his disagreement with Dr. Rizvi regarding whether or not Plaintiff technically has Rheumatoid arthritis cannot form the basis of a valid claim as Plaintiff has failed to show he did not receive adequate treatment, and in any event Plaintiff's medical records indicate that he "does not have significant active rheumatoid arthritis," and that he therefore did not require significant treatment for the condition. (Document 5 attached to ECF No. 84 at 46). Plaintiff's disagreement with Dr. Rizvi's diagnosis thus appears to be little more than a semantic dispute over the difference between not having a clinically significant, treatable case of rheumatoid arthritis and not having the disease at all.

Plaintiff also appears, however, to raise in his complaint a medical claim based on the failure of the Corrections Officer Defendants to take his conditions into account in relation to his refusal to go into the upper tier cell to which he was assigned after leaving the jail infirmary. To the extent Plaintiff does raise such a claim, however, it is clear based on Plaintiff's own submissions that that claim must fail. By Plaintiffs own admission, the Corrections Officer Defendants, other than the unserved John Doe Officer who assigned Plaintiff to an upper tier cell saw him walk to his unit, directed him to an upper cell, and when he refused to climb the stairs to his cell the "officers on duty told me they would carry me up the stairs," an offer Plaintiff refused. (ECF No. 92 at 4). It was only after Plaintiff refused this offer that the issue was raised to Defendants Brandt and Wohl and Plaintiff again refused to go to or be carried to his assigned cell that Plaintiff was charged with disobeying an order and placed in administrative segregation. (*Id.* at 4-5). Thus, based on Plaintiff's own version of the facts of this issue presented in his reply brief, the named Corrections Officer Defendants, when told Plaintiff could not climb the stairs – an inability they had no reason to be aware of previously – offered to accommodate him as best they could under the circumstances and in the absence of an available lower tier cell (*see* Document 3 attached to ECF No. 87 at 55), and only when Plaintiff refused this accommodation did the situation escalate and result in Plaintiff's placement in a segregation cell. Indeed, by Plaintiff's own admission, even in segregation after the first night when he was carried to, and the following morning from, his cell, he was moved to a lower tier cell. Under these facts as admitted by Plaintiff, the Corrections Officer Defendants were not deliberately indifferent to his needs once informed of them. The named Corrections Officer Defendants are thus entitled to summary judgment as, by Plaintiff's own admission, they attempted to accommodate his needs by carrying him to a cell until a lower tier cell was available.

Finally, Plaintiff pled a claim for deliberate indifference in his complaint against a John Doe Officer who was responsible for initially assigning Plaintiff to the upper tier cell to which he refused to go, allegedly knowing of Plaintiff's medical conditions. Plaintiff never amended his complaint to name or identify this officer, and the time for doing so has long passed. As Plaintiff has failed to identify this Defendant, and has offered the Court no basis for concluding that he could not have done so through reasonable diligence, Plaintiff's claim against the John Doe Officer who assigned him to an upper tier cell is dismissed without prejudice. *See, e.g., Parker v. United States*, 197 F. App'x 171, 173 n. 1 (3d Cir. 2006); *Mutschler v. Corby*, No. 16-327, 2017 WL 3894681, at *2 (W.D. Pa. Sept. 6, 2017).

### 2. Plaintiff's Disciplinary Claims

The Corrections Officer Defendants also argue that they are entitled to summary judgment as to Plaintiff's Disciplinary related claims including Plaintiff's claims against Wohl, Brandt, and Shelly for instituting charges against him for failing to follow orders by refusing to go into his upper tier cell with or without assistance, a claim against Shelly for allegedly "falsely" reporting that Plaintiff refused the order to go to his cell, and a Due Process claim alleging that the hearing officer, Defendant Condito, failed to timely deliver him a copy of the result of Condito's investigation into Plaintiff's charges.

Turning first to Defendants Wohl, Brandt, and Shelly, the filing of even false reports charging a detainee with a disciplinary infraction is, in and of itself, not a constitutional violation. *See, e.g., Poole v. Mercer Cnty. Corr. Ctr.*, No. 11-3730, 2012 WL 694689, at *2 (D.N.J. Feb. 29, 2012); *see also Mimms v. U.N.I.C.O.R.*, 386 F. App'x 32, 36 (3d Cir. 2010) (the "filing of false disciplinary charges does not constitute a claim under § 1983 so long as the inmate was granted a

13

hearing and an opportunity to rebut the charges"); *Smith v. Mensinger*, 293 F.3d 641, 653-54 (3d Cir. 2002). In this matter, the charging Defendants charged Plaintiff with failing to lock into his assigned cell after being instructed to do so. Although Plaintiff claims that Defendants Wohl, Brandt, and Shelly "falsely" asserted that he refused to lock into his cell, the facts that he admits in his own reply show that he was instructed to do so, said he was unable, and refused an offer to be carried to his cell. Although he and the officers may certainly differ whether this is a true "refusal" to lock into his cell, that Plaintiff considers this something less than an outright refusal doesn't make the charges made against him by Wohl, Brandt, and Shelly "false," let alone show that they somehow denied him Due Process by charging him with this infraction. As Plaintiff has not even attempted to show that these Defendants denied him Due Process in charging him and filing the "false" reports, he has failed to present a viable claim against them, and Defendants Wohl, Brandt, and Shelly are entitled to summary judgment as to Plaintiff's disciplinary claims.

Turning to Defendant Condito, Plaintiff appears to claim that he was Denied Due Process because Conditio told him he'd investigate his claim that he should not be punished as he was medically unable to go to his cell, and then did not provide Plaintiff with the result of that investigation before Plaintiff was released from segregation seventy-two hours later after it was determined that he should not have been placed in segregation. By Plaintiff's own admission, after seventy-two hours, he was released from segregation. (*See* Document 3 attached to ECF No. 87 at 62). Prison records indicate that he was so released because the charges against Plaintiff were dismissed, presumably by Condito. (Document 1 attached to ECF No. 94 at 43). Plaintiff's claim against Condito thus appears to be entirely based on Plaintiff's belief that Condito should have resolved his charges and released him within forty-eight hours rather than the seventy-two he spent in segregation. Based on the facts presented, Plaintiff's claim thus boils down to his allegation

that he was entitled to a decision within two days rather than three. While the Due Process Clause of the Fourteenth Amendment does entitle a pretrial detainee to notice, an opportunity to be heard including a limited right to present evidence and witnesses, and a written explanation of any disciplinary action taken[5] as a result of the hearing on a Plaintiff's disciplinary charge, it does not require that disciplinary investigations be completed within forty-eight hours. *See, e.g., Kanu v. Lindsey*, No. 13-6451, 2016 WL 1086565, at *5 (E.D. Pa. Mar. 21, 2016). Plaintiff was thus not entitled by the Constitution to a disciplinary decision within the forty-eight hours about which he complains, and Defendant Condito is therefore entitled to summary judgment as to Plaintiff's Due Process claim related to his disciplinary proceedings.

### 3. Plaintiff's Grievance Related Claims

Defendants Hendricks is named as a Defendant in this matter solely based on his alleged failure to respond to various grievances Plaintiff filed related to his medical claims. Hendricks argues that, to the extent Plaintiff seeks to hold him liable based on the lack of responses to Plaintiff's grievances as a stand-alone claim separate and apart from his medical treatment claim, Plaintiff's grievance related claim is based on an untenable theory of relief. The United States Constitution does not provide a state detainee or inmate with a right to an inmate grievance system, nor does it provide a right for such prisoners to have their grievances addressed to the extent the state has proactively created such a system. *See, e.g., Roberts v. Aviles*, No. 10-5916, 2012 WL

---

[5] Plaintiff neither alleged nor testified at his deposition that any specific disciplinary action was taken following the investigation of Condito, instead stating that he does not know what, if anything came of his charges other than his release after three days. Prison records show that the charges against him were dismissed. Because Plaintiff did not receive any disciplinary punishment following Condito's investigation, that he did not receive a written decision stating the reasons for disciplinary action does not give rise to a Due Process violation.

15

603790, at *1 n. 4 (D.N.J. Feb. 16, 2012); *Wilson v. Horn*, 971 F. Supp. 943, 947 (E.D. Pa.), *aff'd*, 142 F.3d 430 (3d Cir. 1998); *see also Adams v. Rice*, 40 F.3d 72, 75 (4th Cir. 1994) ("the Constitution creates no entitlement to grievance procedures or access to any such procedure voluntarily established by a state"). Thus, to the extent that Plaintiff's claim against Hendricks is based solely on the failure to respond to grievances, rather than using the grievances as a method to connect Hendricks to his failed medical claims discussed above, that claim fails to state a valid basis for relief. Hendricks is entitled to summary judgment as to Plaintiff's grievance related claim.

### 4. Plaintiff's Excessive Force Claims

In his final series of claims, Plaintiff argues that Defendants Alvarez[6] and Brandt used excessive force against him in taking his cane and carrying him to his cell following his placement in administrative segregation and assignment to an upper tier cell. Defendants in turn argue that they are entitled to qualified immunity as to this claim because, to the extent Plaintiff presents a valid excessive force claim, the right Plaintiff seeks to vindicate, when addressed at the appropriate level of specificity, was not clearly established when this incident occurred in 2015. "The doctrine of qualified immunity shields government officials who perform discretionary functions 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Santini v. Fuentes*, 795 F.3d 410, 417 (3d Cir. 2015) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). "When properly applied, [qualified immunity] protects all but the plainly incompetent or those who

---

[6] It appears Defendant Alvarez was not properly served in this matter, as service upon him was refused on the basis that multiple individuals at the jail share that last name (*see* ECF No. 10). However, because Defendants' arguments regarding Defendant Brandt's entitlement to qualified immunity are equally applicable to Defendant Alvarez, the issue of whether Defendant Alvarez is entitled to qualified immunity is discussed alongside the analysis pertaining to Brandt.

16

knowingly violate the law." *Spady v. Bethlehem Area Sch. Dist.*, 800 F.3d 633, 637 (3d Cir. 2015) (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, (2011)).

Entitlement to qualified immunity is evaluated using a two-pronged analysis. "First a court must decide 'whether the facts that a plaintiff has . . . shown make out a violation of a constitutional right'[, a]nd second, the Court must determine 'whether the right at issue was clearly established at the time of [the] defendants alleged misconduct.'" *Id.* (quoting *Pearson v. Callahan*, 555 U.S. 223, 232 (2009)).  Where a plaintiff's claim fails to clear either hurdle, the officer is entitled to qualified immunity, and a reviewing court may therefore address only the clearly established prong where it is dispositive of the immunity issue. *James v. New Jersey State Pol.*, 957 F.3d 165, 168-69 (3d Cir. 2020).  A right is clearly established where "existing precedent [has] placed the statutory or constitutional question *beyond debate*." *Spady*, 800 F.3d at 638 (quoting *al-Kidd*, 131 S. Ct. at 2083).   With the exception of cases involving "obvious violations" of the rules put in place by prior Supreme Court precedent, a plaintiff's claim will only be "clearly established" where "the violative nature of the *particular* conduct [was] clearly established." *James*, 957 F.3d at 169 (quoting *Ziglar v. Abbassi*, --- U.S. ---, ---, 137 S. Ct. 1843, 1866 (2017)).  The conduct in question must therefore be defined at an "appropriate level of specificity," *Spady*, 800 F.3d at 638, and, when so defined, the plaintiff must identify "a case where an officer acting under similar circumstances . . . was held to have violated" the constitutional provision in question. *James*, 957 F.3d at 169-70.  For the purposes of this analysis, "clearly established rights are derived either from binding Supreme Court and Third Circuit precedent or from a robust consensus of cases of persuasive authority in the Courts of Appeals" in effect at the time of the conduct in question. *Id.* at 170.

In this case, the conduct about which Plaintiff complains is an alleged incident of excessive force in which Defendants Brandt and Alvarez "unannounced and suddenly" took his cane, picked him up, and carried him to an upper tier cell before placing him down and returning his cane after he told the officers that he could not climb the stairs to his cell himself. (*See* ECF No. 92 at 5; ECF No. 1 at 12). Although this Court readily accepts that Plaintiff may have suffered some pain during this incident in light of his medical issues, Plaintiff has failed to identify any cases finding that the officers' conduct defined at the appropriate level of specificity – without permission lifting and carrying an inmate unable to climb the stairs to his cell before returning his walking aid upon placing him in said cell – amounts to excessive force sufficient to violate the constitution. This Court is likewise unaware of any Third Circuit or Supreme Court case addressing similar conduct under similar circumstances, nor does there appear to be a robust consensus of federal appellate cases on point. Thus, to the extent Plaintiff's excessive force claim would state a claim for relief under the Fourteenth Amendment, any such claim is not based on clearly established law, and Defendants Brandt and Alvarez are therefore entitled to qualified immunity, and in turn summary judgment, as to that claim.

### III. CONCLUSION

      For the reasons stated above, this Court GRANTS Defendants' motions for summary judgment (ECF Nos. 84, 87).  Because judgment will be entered in favor of all moving Defendants on the relevant claims, the Corrections Officer Defendants' third-party complaint against the Medical Defendants is in turn DISMISSED.  An appropriate order follows.

                                               s/ Stanley R. Chesler
                                          STANLEY R. CHESLER
                                          United States District Judge

Dated:  September 25, 2020